STATE OF VERMONT

ENVIRONMENTAL COURT

Appeal of Agnes Mitchell Trust   }
                               }
                               }        Docket No. 10-1-03 Vtec
                               }
                               }

Decision and Order

Appellant Agnes Mitchell Trust appealed from a decision of the Planning Commission of the Town of Huntington granting final subdivision approval with conditions for six of nine proposed lots in a nine-lot residential subdivision, and denying final subdivision approval for the remaining three lots. Appellant is represented by Michael Marks, Esq.; Interested parties Lynn Ann Reynolds, Robin Worn, and David Brosius appeared and represented themselves; the Huntington Conservation Commission appeared through its Chair, Aaron Worthley; and the Town is represented by David L. Grayck, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. Judge Wright had taken a site visit in an earlier case dealing with the same property, Docket No. 47-4-01 Vtec, and by agreement of the parties did not take another site visit in the present appeal. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellant proposes to subdivide a 19.3-acre parcel of land with frontage on Main Road near its intersection with Hinesburg Hollow Road. Approximately 12.7 acres of the parcel is located in the Village zoning district. Approximately 6.6-acres in the south and west of the property is located in the Residential-Agricultural zoning district. The district boundary cuts at an angle across the southerly portion of the parcel from west to southeast. Although the portion of the property located in the Residential-Agricultural zoning district is proposed to form the majority of Lot 9 and the southernmost portions of Lots 4, 8, 7, and 6, none of the property within the Residential-Agricultural zoning district is proposed for construction.

The property is roughly a long truncated triangle in shape, with approximately 673 feet of frontage on Main Road. It is relatively flat and open from Main Road towards the west, with a wooded upland portion of the property cutting obliquely across the southwesterly end of the property. The wooded upland extends to the south and west across neighboring properties, forming an extensive woodland. A stream referred to as Hollow Brook, with its 100-year floodplain, runs along the northerly property boundary. A ditch or swale cuts across the property roughly from south to north, extending from the property's southerly boundary to join Hollow Brook midway along the property's northerly boundary.

Class Two wetlands occupy approximately half of that portion of the property located in the Village zoning district. Class Two wetlands adjoin Hollow Brook and adjoin the swale or ditch, and also extend across much of the southern portion of the property from Main Road to the edge of the wooded upland and along the western portion of the property across the width of the property to Hollow Brook. Under the Vermont Wetland Rules, the presence of this extent of Class Two wetlands on the property constrains the potential for development of the property.

Two areas on the property not classified as Class Two wetlands are proposed for development: a larger area (the front or east area) east of the swale or ditch, between it and the Main Road

frontage of the property, and a smaller area (the back or west area) to the west of the swale or ditch. The project property is proposed to be divided into nine lots, each of which is proposed for a single family house and to be supplied by a drilled well, and each of which has access to Main Road via a common road or a driveway to the common road.

Proposed Lot 1 has frontage on Main Road and access from the project roadway. It includes an area for a 4-bedroom single-family house and its driveway. Lot 1 also includes an area subject to an easement benefitting the other eight lots, containing the common leach fields for the septic systems for all nine houses. Lot 1 also includes the land lying under the project road right-of-way and its hammerhead turnaround. A 24-foot-wide private road within this 50-foot wide extension of Lot 1 is proposed to provide access for the house sites on the front six lots: Lots 1, 2, 5, 6, 7, and 8. The hammerhead turnaround is an approximately 50' x 60' rectangular space that provides a place for vehicles to turn around by executing a three-point turn, but is not a circular turnaround or cul-de-sac. The driveway for proposed Lots 3, 4, and 9 continues as a 16-foot-wide roadway, also within a fifty-foot-wide right-of-way.

Proposed Lot 2 is located adjacent to Hollow Brook. It contains a drilled well to serve its proposed 3-bedroom house, and also contains a drilled well to serve the house proposed for Lot 8. This latter well site is located in the wetland buffer on Lot 2. Lots 5, 6, 7, and 8 are located southerly of the project roadway. Each is proposed for a 3-bedroom house, although on Lots 6, 7, and 8 there is very little room on each lot between its required front yard setback along the project roadway and the 50' wetlands buffer in its rear yard. Lots 5, 6, and 7 are each proposed to have an on-site drilled well. All the lots meet the dimensional and lot size requirements of the zoning ordinance.

The house sites proposed for the three back lots (Lots 3, 4, and 9) are located southerly of the private drive for those lots. Lots 3, 4, and 9 are each proposed to be served by an individual drilled well located on each building lot; Lots 3 and 4 are proposed as 3-bedroom houses, while Lot 9, like Lot 1, is proposed as a 4-bedroom house. See Declaration of Protective Covenants in evidence as Exhibit 7, § 2. That section provides a minimum habitable square footage for each of the house sizes, but no maximum size.

Without stating any analysis in the " conclusions'section of its decision of how or why it reached its result, the Planning Commission approved the proposed development of the six front or easterly lots (Lots 1, 2, 5, 6, 7, and 8), including their associated roadways and septic systems, and disapproved the three back or easterly lots (Lots 3, 4, and 9). The applicant appealed this decision, seeking approval of the entire project as originally proposed. No party cross-appealed the approval of the front six lots; they and the overall project are only described in this decision to the extent necessary to provide the context for the appeal relating to whether the back three lots should also be approved.

Under the Vermont Wetland Rules in evidence as Exhibit 8, a fifty-foot-wide buffer zone must be maintained around the Class Two wetlands. The only residential-related activities allowed in the buffer zone without prior state review (§ 6.2(r)) are "the mowing of existing[1] lawns, the placement of barbecue pits, sandboxes, bird houses and other similar activities incidental to ordinary residential use." Any other activities in the wetlands or the wetland buffer would have to receive a prior Conditional Use Determination (CUD) from the state. The Declaration of Protective Covenants applicable to the property requires compliance with permits governing the development (§ § 8 and 15) but does not require compliance with the state wetland rules themselves, nor does it warn owners that under those rules, no construction or activities are allowed in the wetland or wetland buffer areas of the lots without a further CUD. The Declaration of Protective Covenants does not restrict construction to a " building envelope'shown on the proposed plans, and it is not clear from the proposed plans or application narrative whether the house sites are the " building envelope" , or whether houses could be constructed anywhere within the development area for each lot, even adjacent to the wetland buffer, as long as they respected the required setbacks and wetland buffer requirements.

With respect to the development of Lots 3, 4 and 9, the proposed project has received a CUD from the state Agency of Natural Resources allowing the construction of the private drive (serving the three rear lots) to cross the wetland swale and its associated wetland buffer (using a culvert designed to promote the passage of amphibians and other wetland animals), and allowing the installation of the wells for Lots 3, 4, and 9 within the wetland buffer. The CUD and its amendment letter in evidence as Exhibit 3 do not allow any installation of lawns, gardens or other landscaping within the wetlands buffer for any of the lots, and do not allow any mowing of the vegetation within the wetlands buffer for any of the lots except within the 20-foot construction zone behind the house sites for lots 6, 7, and 8. The CUD and its amendment letter in evidence as Exhibit 3 do not allow the use of any pesticides[2] or fertilizers within the wetlands buffer for any of the lots, while § 15 of the Declaration of Protective Covenants is inconsistent with it by providing that "only organic[3] fertilizers and pesticides may be used in the wetland buffer areas depicted on the Plan." The (inner) edge of the wetlands buffer (or the allowed encroachments for the well sites and road right-of-way) is required by the CUD to be memorialized in the field by a fence, stone wall, or row of shrubs. Condition 5 of the Planning Commission approval requires the memorialization to be accomplished with natural wood or stone fencing not more than four feet in height nor less than 1 foot in height that would allow the passage of wildlife.

A deer yard used by deer for seasonal feeding and protective winter habitat is located within and on the wooded upland area in the southwest of the property, extending almost to the edge of the trees as shown on Exhibit H in evidence and as described by Professor Capen in his testimony about his field observations. Ordinary residential activities of people and their pets within the southerly wetland and wetland buffer on proposed Lots 9 and 4, as well as at the house sites and the southerly portion of the development area shown as proposed for those lots, especially domestic dog activity, will adversely affect the use by deer of the deer yard near the edge of the forested area on those lots. In addition, to allow any dogs from any of the lots to run loose on the western three lots will adversely affect the use by deer of the deer yard.

Although Appellant of course does not contest the approval of the six easterly lots, and the potential for disapproval of those lots is therefore not before the Court, the test for the subdivision as a whole is whether it meets each particular standard at issue in the appeal; that is, whether the three westerly lots can be approved in addition to the six easterly lots. Section 400 requires the Planning Commission, and hence this Court, to evaluate any application for final subdivision approval in accordance with these standards, and allows the Commission to approve or deny the application, to require modifications of it, or to impose conditions to " mitigate adverse impacts." We address each of the issues raised in the Statement of Questions.

Whether the proposed subdivision meets the standards of the ordinance because it will not have adverse impacts on wetlands and whether the project site is suitable for the proposed density of nine lots in that it meets the density requirements of the subdivision ordinance and does not adversely impact on wetlands.

Section 400(2) of the Subdivision Regulations requires the proposed subdivision to 'show[] due regard for the preservation and protection of existing natural features, trees, brooks, rock outcroppings, water bodies, or other natural and/or historical resources." Wetlands are included by example in the category of " natural features or resources.'see § 210(10): [an application must show] " the location of all natural features or resources on the site such as streams, ponds, wetlands, floodplain, forest stands, deer yards, etc.'section 400(7) of the Subdivision Regulations requires the Court to analyze whether the site is " suitable" for the proposed density.

First, the proposed subdivision requires some additional reconciliation between the requirements of the Wetland Rules and CUD, on the one hand, and the requirements of the Declaration of Protective Covenants, on the other, in order for the proposed subdivision to show " due regard" for the wetland or to be suitable for development anywhere on the area proposed for Lots 3, 4, and 9.

Although the development area allowed on each of the lots is very small, as it is constrained by the setback requirements of the zoning regulations related to the layout of the road and the lots, and is further constrained by the wetlands existing on site and the limitations on use of the wetlands buffer areas, it is not appropriate to deny a landowner's application solely because of a prediction about whether subsequent buyers of the property will comply with those restrictions. Rather, it is necessary for the limitations on the use of the lots to be fully, clearly and consistently disclosed to the subsequent buyers in their deeds and the covenants and permits applicable to the property, and for an adequate enforcement mechanism to be established so that the association as well as the Town can take steps to enforce those limitations efficiently and fairly.

With respect to effects on the wetlands, if and only if the restrictions in the CUD and the Wetland Rules and the Planning Commission's and this Court's conditions are properly and effectively implemented and enforced, then the wetlands crossing and the establishment of a density of up to three dwelling units within the development area[4] of Lots 3, 4, and 9 are approvable with respect to the criteria of due regard for the preservation and protection of the wetlands, and suitability of the site for the proposed density.

That is, the Declaration of Protective Covenants must be amended to make it completely consistent with the restrictions imposed by the CUD and the Vermont Wetland Rules, to provide an enforcement mechanism for the Association to require compliance with the various restrictions imposed by the CUD and the Planning Commission, and to provide notice to the zoning administrator[5] of any non-compliance, to allow the Town to take its own enforcement action. With such amendments, as required in the conditions below, the proposal will meet the criteria of § § 400(2) and 400(7) of the Subdivision Regulations with respect to the impact of the proposal on wetlands[6]. That is, the proposal will meet the standards in the ordinance regarding protection of wetlands if conditions are imposed to amend the Declaration of Protective Covenants to make it consistent with the Vermont Wetland Rules, the CUD, and the conditions imposed by the Planning Commission and this Court, if the restrictions applicable to each lot are fully disclosed in advance to lot owners and incorporated in the deeds to make them known to subsequent buyers, and if adequate enforcement mechanisms are provided in the Declaration of Protective Covenants so that both the Association and the Town are able to take steps to enforce those restrictions.

Whether the conditions imposed by the Planning Commission violate the terms of the Town of Huntington ordinances and Vermont state law

Nothing in the Town of Huntington ordinances or Vermont state law precludes a town from being more protective of its wetlands, deer yards, or other natural features or resources on the site. Section 400 allows consideration of the preservation and protection of existing brooks and other natural features such as wetlands and deer yards, whether the site is suitable for the proposed density, whether the proposal retains unrestricted access to deer yards, and whether the proposal is " in compliance with" the Town Plan, as well as in compliance with the zoning ordinance and other bylaws. These criteria may be more protective of the Town's resources than state wetlands law or state land use law would be; that policy determination is for each Vermont municipality to make when adopting its town plan and town zoning and subdivision regulations.

Whether the project is suitable for the proposed density, (that is, for development of Lots 3, 4, and 9 in addition to the easterly lots), in that it does not violate any applicable standards of the Subdivision Ordinance concerning wildlife

Section 400(2) of the Subdivision Regulations requires the proposed subdivision to 'show[] due regard for the preservation and protection of existing natural features, trees, brooks, rock

outcroppings, water bodies, or other natural and/or historical resources." Deer yards are included by example in the category of " natural features or resources.'see § 210(10): [an application must show] " the location of all natural features or resources on the site such as streams, ponds, wetlands, floodplain, forest stands, deer yards, etc." In addition, § 400(11) of the Subdivision Regulations requires analysis of whether the proposed development avoids deer yards or provides adequate protection for such deer yards and retains unrestricted deer access to the identified deer yards."

The location of the deer yard on the portion of the wooded area located on this property extends almost to the edge of the wooded area as shown on Exhibit G. Deer use it at least as a seasonal congregating place for extended feeding or wintering purposes. While the proposed development on Lots 3, 4 and 9 avoids the deer yard in that it is not located within the deer yard, as proposed it does not provide adequate protection for the deer yard. The ordinary residential activities of people and their pets within the southerly wetland and wetland buffer located on proposed Lots 9 and 4, as well as at the house sites and the southerly portion of the development area shown as proposed for those two lots, especially domestic dog activity, will adversely affect the use by deer of the deer yard near the edge of the forested area on those lots. In addition, to allow any dogs from any of the lots to run loose on the western three lots will adversely affect the use by deer of the deer yard. The Declaration of Protective Covenants do not adequately prohibit dogs from running loose on the property. Such activity must be made a violation of the covenants and the permit conditions, and not just a possible violation of state wildlife law.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that final subdivision approval for the six lots approved by the Planning Commission remains granted, with the conditions as imposed by the Planning Commission. In addition, due to the following ruling on the application for final subdivision approval for Lots 3, 4, and 9, to address the criteria pertaining to wetlands and the criteria pertaining to deer yards, the following additional condition affecting the Declaration of Protective Covenants (in evidence as Exhibit 7) pertains to the development as a whole.

To address the criteria pertaining to wetlands and the criteria pertaining to deer yards, the application for final subdivision approval for Lots 3, 4, and 9, is ruled on in the alternative as follows, at the election of Appellant-Applicant. Such election shall be made within the time for an appeal to be taken from this decision.

EITHER

Appellant-Applicant may choose the grant of final subdivision approval for Lot 3, together with the denial of final subdivision approval for Lots 4 and 9, and together with the following additional condition affecting the Declaration of Protective Covenants (in evidence as Exhibit 7) pertaining to the development as a whole;

OR

Appellant-Applicant may choose the denial of final subdivision approval for Lots 3, 4 and 9 as currently designed, specifically without prejudice to Appellant's opportunity to design a clustered group of three dwellings or townhomes[7] on combined Lots 3, 4, and 9, clustered within approximately the area now shown as the development area for Lot 3 and the northerly half of the development area for Lot 4, together with the following additional condition affecting the Declaration of Protective Covenants (in evidence as Exhibit 7) pertaining to the development as a whole.

Additional condition pertaining to the development as a whole:

The Declaration of Protective Covenants shall be revised to contain requirements consistent with the Conditional Use Determination (in evidence as Exhibits 3 and 11) granted by the State of Vermont Agency of Natural Resources for the project, and incorporating all the conditions of final subdivision approval imposed by the Planning Commission and this Court, and in particular requiring that the buffer zone (backyard) be memorialized with a wood or stone fence (between 1 foot and 4 feet in height) allowing the passage of wildlife, that the memorialization be maintained over time, that no structures be constructed beyond the memorialization, that the vegetation in the buffer zone not be mowed or cut (and no herbicides be applied), that no pesticides or fertilizers be applied to wetland buffer areas on any lot, that the Homeowners' Association and the individual lot owners are responsible for continued compliance with the requirements of the CUD, including the annual monitoring required by § 1(J), and incorporating the definition of haying for agricultural purposes allowed to occur as provided in Exhibit 11 (as distinguished from the mowing of lawn areas which is not allowed under the CUD).

In addition, paragraph 18 of the Declaration of Protective Covenants shall be amended to require the Association to notify the Zoning Administrator in writing of any Owner's noncompliance with any of the Protective Covenants and whether the Association is taking or has taken any action to enforce.

In addition paragraph 16 of the Declaration of Protective Covenants shall be amended to change the initial " should" to " shall" , to require that dogs be leashed when outside the development area (beyond the wetland buffer memorialization) on any lot, as well as off the owners' lot on the property, and to state that any violation of the leash and control requirement is a violation of the Declaration of Protective Covenants and this permit, as well as of the named sections of Title 10.

Dated at Barre, Vermont, this 26th day of August, 2004.


_____

Merideth Wright

Environmental Judge

_____

### Footnotes

1.    As there is no existing residential use, the establishment or mowing of any lawns within the buffer zone does not appear to fall within this exemption.

2.    Both the CUD and the Declaration of Protective Covenants are silent as to the use of herbicides within the wetland buffer, although the rules would appear to prohibit the chemical removal of plants at least to the extent that mowing or mechanical removal of plants is prohibited.

3.    This term is undefined and unfortunately ambiguous, as 'organic' can connote 'without artificial chemicals' (as in 'organic farming' or 'organic ingredients') or it can mean 'containing

carbon' (as in 'organic chemicals' which include some powerful pesticides, herbicides and fertilizers).

4.	But see further constraints on this development area in the discussion of the deer yard, below.

5.	It may also provide notice to the state wetlands program, but that is beyond the jurisdiction of the Court to require in this decision.

6.	But see footnote 4 above.

7.	As may be allowed under the provisions of the Zoning Ordinance, including any provisions for Planned Residential Developments. The Zoning Ordinance was not offered in evidence by any party and we do not make any specific ruling regarding what is allowed under that ordinance.